UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  2:13-cr-00208-KJN |
| Plaintiff, | |
| v. | ORDER |
| JEFFREY A. CATLETT, | |
| Defendant. | |

Presently before the court is defendant Jeffrey A. Catlett's motion to suppress evidence allegedly obtained in violation of his Fourth and Fifth Amendment rights, filed on August 15, 2013, and noticed for hearing on September 18, 2013.  (ECF No. 37.)  Specifically, defendant seeks to suppress a collection of waterfowl seized from Nevada David Smith's truck, as well as statements made by Smith and defendant to wardens from the California Department of Fish and Wildlife.  (Id.)  On August 28, 2013, the United States filed an opposition to the motion, and on September 4, 2013, defendant filed a reply brief.  (ECF Nos. 42, 43.)  Thereafter, on September 11, 2013, the United States filed a response as to discrete issues outside the scope of the initial motion raised by defendant's reply.  (ECF No. 44.)  Then, on September 16, 2013, defendant filed a supplemental memorandum addressing the purported impact of the Ninth Circuit's September 13, 2013 decision in United States v. Bonds, Case No. 11-10669.

1

At the September 18, 2013 hearing, Barbara Borkowski appeared on behalf of the United States and Mark Steidlmayer appeared on behalf of defendant. (ECF No. 48.) After considering the parties' briefing, the parties' oral argument, and the applicable law, the court denies defendant's motion to suppress.

**I. Background**

The background facts are taken from the parties' motions and police reports attached to defendant's motion. (ECF Nos. 37, 42.) Nevertheless, these facts, disputed or undisputed, are outlined for background purposes only in the context of deciding the instant motion to suppress, and do not constitute formal findings of fact for purposes of the case.

On January 16, 2013, wardens from the California Department of Fish and Game received an anonymous call reporting that a group of hunters had shot into a large flock of geese in Sutter County and killed many birds. Warden Nathan Stebbins responded to the scene and began his investigation. Subsequently, wardens received another phone call and learned that a truck carrying geese had left the scene of the hunt before the wardens arrived. Warden Stebbins suspected that defendant was involved in the illegal hunt and had taken the slain geese somewhere to avoid being caught with too many birds. As such, Warden Stebbins requested assistance from Wardens Brett Gomes and Sean Pirtle in locating the missing truckload of geese.

Warden Pirtle and Warden Gomes began their investigation immediately. Warden Pirtle stated that, based on his past experience, he was aware that defendant regularly hunted with a local resident named Nevada Smith, who had a shop near where the hunt took place. Warden Pirtle suspected that defendant may have taken any geese killed in excess of the legal limit to Smith's shop.

Acting on this hunch, at approximately 1:00 p.m. on January 16, 2013, Warden Pirtle and Warden Gomes arrived at Smith's shop to make inquiries. The wardens made contact with Smith as he was washing his motor-home in front of the shop. Initially, Smith denied hiding birds for defendant, but after further questioning, Smith indicated that he was storing birds in his truck for defendant. At Smith's direction, Warden Pirtle looked in Smith's truck and discovered numerous frozen birds, including ducks and geese of different kinds. None of the birds found in

Smith's truck were fresh from the hunt earlier that day.  However, because possessing such a large quantity of birds is nonetheless illegal, the wardens decided to investigate further.

Warden Pirtle asked Smith how he came to possess such a large number of frozen birds. Smith apparently represented that defendant had called him, stating that wardens were investigating defendant regarding snow geese and that defendant wanted to avoid being caught with too many birds.  Smith told Warden Pirtle that defendant had asked Smith to go to defendant's house and remove all the birds so that the wardens would not discover them.[1]

A short time later, defendant himself appeared at Smith's shop, joining Smith and the wardens.  After Warden Pirtle asked defendant about the large number of frozen waterfowl in Smith's truck, defendant acknowledged that the birds in Smith's truck came from defendant's freezer.  When asked why he had so many frozen birds, defendant stated that he cleans the birds for friends and gives them away, and explained that he thought such possession was legal. Warden Pirtle then asked defendant why, if defendant thought that his possession of the birds were legal, he called Smith to remove the birds from defendant's freezer.  According to the wardens, defendant did not respond.  Warden Pirtle continued, hypothesizing that defendant called Smith because defendant knew his possession of the birds was illegal and thought the wardens were going to find the birds.  According to Warden Pirtle, defendant appeared to agree with that statement.

After conducting an inventory of the fowl in Smith's truck, the wardens noted a total of 175 birds from nine different species.  None of the birds had the requisite identification tags. The wardens determined that defendant was over the possession limit for the waterfowl found in Smith's truck.  Warden Pirtle then asked defendant if he would take the wardens back to his

---

[1] Defendant vigorously contests this version of events.  In particular, defendant denies calling Smith and requesting his help in removing birds from defendant's home.  Instead, defendant claims that Smith, thinking that defendant might be in trouble, took it upon himself to remove the birds from defendant's freezer.  In support of this contention, defendant provided the court with phone records from a particular phone device, purporting to indicate that no call to Smith was made by defendant prior to Smith retrieving the frozen birds.  However, defendant fails to make any showing as to the relevance of this factual dispute to the motion to suppress, i.e., as to whether any Fourth Amendment or Fifth Amendment violations occurred.  Accordingly, the court need not resolve the factual dispute at this juncture.

house to discuss the geese hunt which had occurred earlier that day. Defendant responded that it would not be a problem and instructed the wardens to follow him to his house.

Warden Pirtle and Warden Gomes followed defendant to his house where Warden Stebbins was waiting. Defendant then showed the wardens where he and his friends had placed the snow geese that had been killed earlier that morning.

On January 18, 2013, the wardens again spoke with defendant.[2] After calling ahead and asking for defendant's permission to visit, Wardens Pirtle, Gomes, and Stebbins met defendant at his residence. Defendant was outside his barn when wardens began speaking with him. When asked, defendant said that he was willing to discuss the goose hunt that had occurred on January 16, 2013. The wardens asked defendant about the truckload of geese that had left the scene of the hunt. Defendant stated that he had nothing to say about the truckload of geese and denied ownership of any of the geese in the truck. Defendant then gave wardens more details about the hunt, including who was present at the hunt, how many times defendant shot at the geese, how many geese defendant killed, how many injured geese he picked up, and the location of various hunters' geese.

When asked about the frozen geese in Smith's truck, defendant reiterated that he did not call Smith to pick up the geese, but that Smith did so on his own accord. Defendant apparently told wardens that he was aware that he was in possession of too many waterfowl, but justified his actions by saying that he did not allow the birds to go to waste.

On June 7, 2013, the United States filed an information charging defendant with: (1) a misdemeanor violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.37 for possessing migratory game birds belonging to another that are untagged; (2) a misdemeanor violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.33 for exceeding the possession limit of waterfowl; (3) a misdemeanor violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.33 for exceeding the possession limit of pintail ducks; and (4) a misdemeanor violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.33 for exceeding the possession

---

[2] Defendant's motion indicates that the second contact between defendant and the wardens occurred on January 17, 2013. This contradicts the wardens' report, which states that the second contact with defendant occurred on January 18, 2013. As the exact date of this second contact is irrelevant for purposes of the present motion, the factual dispute need not be resolved here.

limit of migratory game birds, namely white geese. (Information, ECF No. 1.) The instant motion followed.

## II. Discussion

Defendant advances several theories in support of suppressing the physical evidence, as well as statements made by himself and Smith. The court addresses each in turn.

**A.** *Alleged Violation of Defendant's Fifth Amendment Rights*

Defendant argues that his statements to the wardens should be suppressed, because he did not receive proper Miranda warnings in violation of his Fifth Amendment rights.

The Miranda requirement attaches "only where there has been such a restriction on a person's freedom as to render him in custody." Stansbury v. California, 511 U.S. 318, 322 (1994). For the purposes of Miranda, a person is in custody "when, based upon a review of all pertinent facts, a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985). "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002) (quoting Stansbury v. California, 511 U.S. at 322 (1994)). The custody determination "focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned." Kim, 292 F.3d at 973.

The Ninth Circuit identified the following five factors as relevant to the custody analysis: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). Additionally, "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person

////

////

would have believed he could freely walk away from the interrogators." Kim, 292 F.3d at 974.[3]

On January 16, 2013, defendant was not in custody when he voluntarily drove to Smith's property and spoke with the wardens. Defendant was neither summoned by the wardens nor coerced into answering questions. To the contrary, defendant interjected himself into a conversation already in progress between the wardens and Smith. Furthermore, defendant was not questioned in an interrogation room or some other unfamiliar place. Perhaps the most convincing fact illustrating the non-custodial nature of defendant's interaction with the wardens is that defendant allowed the wardens to follow him home and continued to speak with the wardens once they arrived. Finally, there is no indication that the wardens used pressure to detain defendant, considering the voluntary nature of defendant's behavior. To be sure, defendant was confronted by evidence of his guilt when wardens questioned him about the large number of frozen birds in Smith's truck. However, this one factor is strongly outweighed by the other factors, as discussed above. Simply put, a reasonable person in defendant's position would not have concluded that he was detained or otherwise not free to leave.

The same analysis applies to defendant's January 18, 2013 contact with wardens at his residence. Ahead of their meeting, Warden Pirtle called defendant and asked if defendant would

---

[3] Troublingly, defendant argues for application of the custody analysis outlined in United States v. Micieli, 594 F.2d 102 (5th Cir. 1979). The Micieli factors include a consideration of the officer's subjective belief. Id. at 105. Thus, Micieli runs contrary to established United States Supreme Court custody jurisprudence requiring an objective circumstances analysis. Stansbury, 511 U.S. at 319, 323. Indeed, defendant fails to mention that the Fifth Circuit itself has abandoned the Micieli approach. See United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988).

In reliance on United States v. Curtis, 568 F.2d 643 (9th Cir. 1978), defendant also posits that a "non-custodial interview may change its character when based upon answers received the interrogator realizes he is no longer willing to let the suspect go and at that point the interrogator has a duty to warn." (ECF No. 37 at 7.) However, defendant points to no facts or circumstances in this case indicating that the wardens ever considered arresting or otherwise detaining defendant, much less objectively manifested an intent to do so. To be sure, the wardens may have come to conclude that defendant is a suspect or even that he was guilty of a crime. But as the United States Supreme Court has made clear, Miranda warnings are not required simply because "the questioned person is one whom the police suspect. Miranda warnings are required only when there has been such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

be home and available to discuss the January 16, 2013 goose hunt.  After receiving permission to visit, the wardens met defendant outside his barn and began speaking with him.  Defendant voluntarily discussed the hunt and subsequent events with the wardens.  While the wardens were in uniform and armed, there is no indication that they brandished their weapons, threatened, or coerced defendant into speaking.  Given the totality of the circumstances, a reasonable person in defendant's position would have felt free to end the discussion with the wardens.

In sum, defendant's statements were voluntary and not given while in custody.  Accordingly, the wardens had no obligation to give defendant Miranda warnings during the January 16, 2013 and January 18, 2013 interactions.

**B.** *Alleged Violation of Smith's Fourth Amendment Rights*

Defendant also argues that suppression of the physical evidence is warranted, because the wardens purportedly violated Smith's Fourth Amendment rights.  As he aptly states in his motion to suppress, defendant "has a high mountain to climb" with respect to standing.  (ECF No. 37 at 5.)  A defendant moving to suppress evidence must show that the defendant's own Fourth Amendment rights were violated.  Rakas v. Illinois, 439 U.S. 128, 134 (1978).  "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."  Alderman v. United States, 394 U.S. 165, 174 (1969).  Thus, even assuming, *arguendo*, that the wardens' actions on Smith's property constituted an unreasonable search, defendant lacks standing to assert Smith's Fourth Amendment rights.  As the United States Supreme Court explained, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."  Rakas, 439 U.S. at 134.

Defendant claims that, because he was jointly charged with Smith in three possession counts, defendant and Smith are "somewhat legally joined at the hip so that the rights of one impinge on the rights of the other," and therefore defendant has standing to assert Smith's Fourth

////

////

7

Amendment rights.[4]  (ECF No. 37 at 5.)  Defendant's argument is unpersuasive and borders on the frivolous in light of well-established legal authority.  As the United States Supreme Court held in U.S. v. Salvucci, "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated."  U.S. v. Salvucci, 448 U.S. 83, 85 (1980).

Furthermore, defendant suffered no Fourth Amendment violations of his own by virtue of the wardens entering Smith's property and searching Smith's truck.  "The burden is on the defendants to establish that, under the totality of the circumstances, the search or the seizure violated their legitimate expectation of privacy."  United States v. Reyes-Bosque, 596 F.3d 1017, 1026 (9th Cir. 2010).  To carry this burden, a defendant must show that he harbored a subjective expectation of privacy in the place searched that is objectively reasonable.  Rakas, 439 U.S. at 143 n.12.  Here, defendant's motion makes no plausible showing that defendant enjoyed any legitimate expectation of privacy in Smith's property.  Indeed, defendant fails to even assert a subjective expectation of privacy with respect to Smith's property.

Finally, even if defendant had standing to vicariously assert claims for violation of Smith's Fourth Amendment rights, the wardens' actions did not run afoul of Smith's rights, because the wardens' entry onto Smith's property and their search of Smith's truck were lawful.

It is permissible for law enforcement officers to approach a home to make contact with inhabitants.  Such activity, known as a "knock and talk," does not violate the Fourth Amendment so long as the officers' actions "are consistent with an attempt to initiate consensual contact with the occupants of the home."  United States v. Perea-Rey, 680 F.3d 1179, 1187-88 (9th Cir. 2012).  When the wardens went to Smith's property to ask him questions regarding the hunt that had

---

[4] Defendant relies solely on Brendlin v. California for his contention that defendant can assert Smith's Fourth Amendment rights.  Brendlin v. California, 551 U.S. 249 (2007).  In Brendlin, the United States Supreme Court held that when police make a traffic stop, a passenger in the car is seized for Fourth Amendment purposes and thus may challenge the stop's constitutionality.  Id. at 251.  However, the Court in that case focused on the passenger's necessary and compulsory involvement in the traffic stop, thereby giving the passenger standing to raise Fourth Amendment claims.  Id. at 257.  Here, defendant was not at all involved in the search of Smith's truck.  Instead, defendant impermissibly attempts to vicariously assert Smith's Fourth Amendment rights.

occurred earlier that day, Smith was outside his shop washing a motor-home in the driveway. The wardens' consensual contact with Smith on his driveway constituted a lawful knock and talk and therefore did not violate the Fourth Amendment.

Likewise, the wardens' search of Smith's truck did not violate the Fourth Amendment. "[I]t is… well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Such consent to search must be voluntary and can be either express or implied.  United States v. Rothman, 492 F.2d 1260, 1263 (9th Cir. 1973); Morgan v. United States, 323 F.3d 776, 781 (9th Cir. 2003).  "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion… is a question of fact to be determined from the totality of all the circumstances." Bustamonte, 412 U.S. at 227.  In this case, the fact that Smith directed wardens to the location of the frozen birds, in the absence of any duress or coercion, supports a conclusion that Smith voluntarily consented to the search of his truck.

In sum, the court finds that defendant has no standing to assert Smith's Fourth Amendment rights, and that in any event, no Fourth Amendment violations had occurred with respect to the entry onto Smith's property and search of Smith's vehicle.

**C.** *Alleged Violation of Smith's Fifth Amendment Rights*

Defendant further argues that Smith's statements to the wardens should be suppressed, because the wardens failed to provide Smith with Miranda warnings in violation of Smith's Fifth Amendment rights.

Again, defendant plainly lacks standing to assert Smith's Fifth Amendment rights.  The Fifth Amendment of the United States Constitution provides that "[n]o person… shall be compelled in any criminal case to be a witness against *himself*." (emphasis added).  While "the Constitution explicitly prohibits compelling an accused to bear witness 'against himself'[] it necessarily does not proscribe incriminating statements elicited from another." Couch v. United States, 409 U.S. 322, 328 (1973).  The Fifth Amendment is a personal constitutional protection; "[i]t is extortion of information from the accused himself that offends our sense of justice." Id.

1  Defendant colorfully posits, without any legal authority, that, because he and Smith are charged
2  with joint possession of the same birds, they "are legal siamesed [sic] twins so the rights of one
3  affects the other." (ECF No. 37 at 7.)  However, given the personal nature of the Fifth
4  Amendment's protection against self-incrimination, defendant's vicarious claim does not pass
5  muster.  Moran v. Burbine, 475 U.S. 412, 434 n.4 (1986).

6  Even if defendant had standing to assert Smith's Fifth Amendment rights, no suppression
7  is warranted, because the wardens' actions did not violate Smith's Fifth Amendment rights.
8  Smith was clearly not in custody when he spoke to the wardens on January 16, 2013.  There is no
9  indication that the wardens used forceful language or other displays of authority to summon
10  Smith; the wardens' conversation with Smith occurred in his own driveway; and Smith's
11  movement was never restricted.  After discovering the large number of frozen waterfowl in
12  Smith's truck, it could be fairly said that Smith was confronted with evidence of guilt.  But again,
13  this factor alone is not sufficient to find that Smith was in custody, especially given the generally
14  voluntary and seemingly cooperative nature of the interaction.  While, as defendant points out,
15  "wardens didn't come to [Smith's property] willy nilly" (ECF No. 37 at 7), the wardens were
16  under no obligation to give Miranda warnings to Smith, because Smith was not in custody.

17  Therefore, the court finds that defendant has no standing to assert Smith's Fifth
18  Amendment rights, and that in any event, no Fifth Amendment violation occurred in the wardens'
19  interactions with Smith.

20  **D.** *Defendant's Discovery Issues Raised In His Reply Brief*

21  In his reply brief, defendant contends that the United States has a duty "to conduct a
22  further investigation to put the true facts before the [c]ourt and give defendant a true predicate for
23  which to make motions to suppress." (ECF No. 43 at 1.)  Specifically, defendant seeks a further
24  investigation by the United States regarding the other alleged owners of the waterfowl found, and
25  as to whether defendant called Smith and instructed him to retrieve the frozen waterfowl from
26  defendant's freezer.  In support, defendant cites Commonwealth of N. Mariana Islands v. Bowie,
27  243 F.3d 1109 (9th Cir. 2001), and Brady v. Maryland, 373 U.S. 83 (1963).
28  ////

As an initial matter, the purported discovery issues that defendant raises in his reply are beyond the scope of his motion to suppress. Although defendant asserts, in conclusory fashion, that these discovery issues impact the motion to suppress, there is no indication that the existence of other alleged waterfowl owners and the factual dispute concerning Smith's removal of the waterfowl from defendant's freezer have any bearing on whether defendant's (or Smith's) Fourth and Fifth Amendment rights were violated by the wardens. While these issues may or may not have some relevance at trial for other reasons, they are irrelevant to the motion to suppress.

Furthermore, there are no facts here suggesting that the United States failed to comply with its obligations under Brady. Indeed, defendant does not identify any evidence that the United States possesses, but has failed to produce. Defendant's reliance on Bowie is also misplaced. In Bowie, the court held that the prosecution violated the defendant's due process rights when it failed to investigate a letter seized from a cooperating witness, which suggested perjury by the prosecution's main witness against the defendant. Bowie, 243 F.3d 1109. Defendant has identified no such evidence in this case. For example, even though defendant offers phone records from a certain phone to suggest that he did not call Smith prior to Smith removing the waterfowl from defendant's freezer, defendant may well have used another phone device. On the other hand, defendant may ultimately be able to convince the trier of fact that Smith lied, which may bear on Smith's credibility and other issues. Regardless, at this juncture, there does not appear to be any "smoking gun" that the United States has somehow concealed from defendant. To the contrary, unlike in Bowie, where the prosecution failed to disclose the evidence of perjury, the defendant here is aware of, and has gathered evidence he believes contradicts, the United States' claim that defendant instructed Smith to retrieve the frozen birds from defendant's freezer. If defendant believes or has evidence that the United States' investigation was imperfect, then the defense will have fodder for cross-examination or the defense case-in-chief.

Finally, the court looks with disfavor on defendant's unsolicited supplemental memorandum filed less than two days prior to the hearing. While such a memorandum may be appropriate to apprise the court of recently decided, binding authority that bears on the precise

11

questions involved in a pending motion, defendant's memorandum addressed the Ninth Circuit's September 13, 2013 decision in <u>United States v. Bonds</u>, Case No. 11-10669, which has little, if any, relevance to the pending motion.  In <u>Bonds</u>, the Ninth Circuit affirmed Barry Bonds's conviction for obstruction of justice, reasoning that factually true statements to a grand jury that are nonetheless evasive or misleading constitute an obstruction of justice.  Defendant's vague attempt to tie this general principle to an alleged inadequate investigation by the wardens is unpersuasive.  Moreover, defendant's requests in that memorandum, which include requests that the court dismiss the matter, remand the matter for a superseding information, etc., are entirely unsupported by any legal authority.

*Defendant's counsel is hereby cautioned that any future failure to comply with the court's briefing deadlines and failure to support arguments or contentions with appropriate and pertinent legal authorities may result in the imposition of sanctions.*

**III.  Conclusion**

For the reasons stated above, IT IS HEREBY ORDERED that defendant's motion to suppress (ECF No. 37) is DENIED.

Dated:  September 20, 2013

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE